UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO: 3:07CV-351-R

TEAMSTERS LOCAL UNION NO. 89                    PLAINTIFF
                                    COUNTERCLAIM DEFENDANT

v.

THE KROGER CO.                                    DEFENDANT
                                        COUNTERCLAIMANT

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS
                                    COUNTERCLAIM DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court on the Plaintiff Teamsters Local Union No. 89's ("Local

89") Motion to Dismiss the Counterclaim (Docket #14).  The Defendant Kroger Co. ("Kroger")

has responded (Docket #26), and Local 89 has replied (Docket #30).  This matter is now ripe for

adjudication.  For the following reasons, Local 89's Motion to Dismiss is **GRANTED in part**

and **DENIED in part.**

## BACKGROUND

This matter arises from a complaint to compel arbitration filed in this Court by Local 89

against Kroger.  Kroger has filed counterclaims against both Local 89 and the International

Brotherhood of Teamsters ("IBT"), the international union of which Local 89 is a local member,

for breach of a collective bargaining agreement and for violation of the secondary boycott law.

Local 89 is local union, with its principal office and place of business in Louisville, Kentucky,

chartered by IBT.  Jurisdiction rests in this Court on Sections 301 and 303 of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. §§ 185 and 187.

In the fall of 2006, Kroger announced its intention to transfer operational responsibility

for its Distribution Center in Louisville, Kentucky ("KDC") to the subcontractors Transervice Logistics, Inc. and Zenith Logistics.  At that time, Kroger employees at the KDC were represented by Local 89 for the purposes of collective bargaining, and Kroger and Local 89 were party to a collective bargaining agreement known as the Kroger Master Agreement ("Master Agreement"), effective September 11, 2005, through September 10, 2011, as well as a local supplemental agreement covering issues related to local operations.

Kroger alleges that beginning in October 2006, Fred Zuckerman, the President of Local 89 as well as the President of Teamsters Joint Council 94 and the Kentucky-West Virginia Conference of Teamsters, made numerous and continuing threats in negotiating sessions with Kroger representatives and in the media to engage in a strike against Kroger over the transfer of operations.  Zuckerman announced his intention to picket Kroger at locations in cities other than Louisville and boycott Kroger retail stores.  Kroger also alleges that Zuckerman continuously threatened a strike by former Kroger employees against Kroger after they were hired by Transervice and Zenith.

Kroger alleges that these threats were supported, ratified and encouraged by IBT through promises to pay strike benefits both to striking Kroger employees and striking Transervice and Zenith employees should Local 89 decide to picket Kroger.  Kroger also alleges that due to the threatened strike, beginning in October 2006 it expended considerable sums of money for additional security, recruitment, and training of a replacement work force.

Kroger lodges two counts against Local 89 in its Counterclaim.  First, Kroger argues the strike threats were in violation of Article 9 of the Master Agreement, the "no-strike clause," which states "the Union agrees that there shall be no strike or any other interference with or

2

interruption of the normal conditions of the Employer's business by the Union or its members."
Kroger asserts that the strike threats were a breach of contract under § 301 of the Labor
Management Relations Act (LMRA).  Second, Kroger argues that the threats to cause a strike by
Transervice and/or Zenith employees were in violation of the secondary boycott law, 29 U.S.C.
§158(b)(4)(ii)(B).

## STANDARD

"When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of
Civil Procedure, the district court must accept all of the allegations in the complaint as true, and
construe the complaint liberally in favor of the plaintiff."  *Lawrence v. Chancery Court of Tenn.*,
188 F.3d 687, 691 (6th Cir. 1999) (citing *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995)).
Denial of the motion is proper "unless it can be established beyond a doubt that the plaintiff can
prove no set of facts in support of his claim which would entitle him to relief."  *Achterhof v.
Selvaggio*, 886 F.2d 826, 831 (6th Cir.1989) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46
(1957)).  Nonetheless, unwarranted factual inferences or legal conclusions masquerading as fact
will not prevent a motion to dismiss.  *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir.
2002).  A "complaint must contain either direct or inferential allegations respecting all the
material elements to sustain a recovery under some viable legal theory."  *Andrews v. Ohio*, 104
F.3d 803, 806 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir.
1993)).

## DISCUSSION

Local 89 argues that Kroger's counterclaim should be dismissed because (1) as to Count
I, Kroger is required by the Master Agreement to submit its strike claim to arbitration; (2) in the

alternative, Kroger's breach of contract claim under §301 is subject to a six-month statute of limitations, which has run; and (3) as to Count II, Kroger has failed to state a cognizable secondary boycott claim because it alleges not secondary activity but a primary dispute.

Kroger's counterclaim against Local 89 is identical in content to its counterclaim against IBT.  In a separate opinion and order addressing IBT's  Motion to Dismiss the Counterclaim, the Court has granted IBT's  motion and dismissed Kroger's counterclaim against it.  As discussed below, the Court will dismiss Kroger's counterclaim against IBT in its entirety for those same reasons.

For these reasons, the Court will only address Local 89's arguments (1) and (3), as the resolution of these claims is dispositive of this Motion to Dismiss.

**1.  Failure to submit the claim to arbitration**

Local 89 argues that Kroger's complaint is not properly before this Court because Kroger failed to exhaust its contractual remedies regarding Local 89's alleged violation of the no-strike clause before bringing its claim to court.  Local 89 asserts that arbitration is the proper forum for addressing Kroger's allegation of contractual violation.

"The issue of arbitrability is a question for the courts and is to be determined by the contract entered into by the parties, and 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Drake Bakeries, Inc. v. American Bakery & Confectionery Workers International,* 370 U.S. 254, 256 (1962) (citing *United Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)).  "An arbitration provision can be broad or restricted in accordance with the agreement of the parties.  In case of disagreement over whether a particular issue between the parties is an arbitrable one under the contract," it is the Court's

4

duty to engage in contract interpretation "and determine that question." *Jefferson City Cabinet Co. v. Int'l Union of Elec.*, 313 F.2d 231, 232 (6th Cir. 1963). The Court has the power to require the parties to arbitrate if it concludes that the issue is an arbitrable one under the agreement or to allow the aggrieved party to attempt to enforce its claim in an appropriate judicial proceeding. *Id.* at 233 (citing *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 462 (1962); *United Steelworkers v. Am. Mfg Co.*, 363 U.S. 564 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).

All of this "is purely a question of contract construction" for the Court. *Id.* Accordingly, in reviewing whether Local 89's Motion to Dismiss the Counterclaim should be granted on these grounds, the Court must determine, as a matter of law, whether, under the grievance provisions of the Master Agreement, Kroger's claim for damages for breach of the no-strike provision is arbitrable. If so, Kroger should submit its counterclaims to arbitration instead of bringing them before the Court. Specifically at issue is whether the arbitration clause contained in the Master Agreement is so narrowly drawn as to exclude employer-driven arbitration.

The arbitration clause in Article 8, Section 8.1 of the Master Agreement provides:

> Should any employee have any grievance dispute or complaint over the interpretation or application of the contents of this Agreement, there shall be an earnest effort by the employee, the Union and the Employer to settle the matter promptly.

The grievance procedure goes on to provide for binding arbitration before a joint committee in the event the parties are unable to resolve a grievance and for binding arbitration before an impartial arbitrator in the event the joint committee is deadlocked.

The no-strike clause in Article 9, Section 9.1 states:

> During the term hereof, the Union agrees that there shall be no strike or any other interference with or interruption of the normal conditions of the Employer's business by

5

the Union or its members.  The Employer agrees that there shall be no lockout.

Section 9.3  provides in regards to grievances:

Within five (5) working days of filing a grievance claiming violation of this Article, the parties to this Agreement shall proceed to the final step (Article 8, Section 8.1, Step 3) of the grievance procedure without taking any intermediate steps, and other provision of this Agreement to the contrary notwithstanding.

Local 89 argues that the no-strike clause is part of the collective bargaining agreement, and therefore a dispute over whether it has been violated is arbitrable, because the arbitration clause provides for arbitration of "any grievance...over the interpretation or application...of this Agreement."  Local 89 asserts that because the parties bargained for an agreement with an arbitration clause, Kroger has an obligation to utilize it and bring its complaint over Local 89's alleged violation of the no-strike clause to arbitration before bringing it to court.

In contrast, Kroger argues that it could not have brought its complaint to arbitration before bringing it to Court because the Agreement only permits arbitration of a grievance brought by an *employee*.  Kroger, as the *employer*, is not permitted to initiate a grievance that could be referred to arbitration.  It points to the fact that the introductory paragraph in Section 8.1 states "[s]hould any *employee* have any grievance dispute or complaint..." and argues that every step of the grievance procedure involves consideration only of employee grievances.  Therefore, Kroger asserts that its counterclaim is the appropriate venue for its claims against Local 89.

Local 89 cites *Drake Bakeries, Inc. v. American Bakery & Confectionery Workers International*, in support of its claim that the Master Agreement's arbitration clause obligates Kroger to arbitrate its claim for damages instead of pursuing the counterclaim.  *Drake Bakeries*, 370 U.S. 254.  The arbitration clause at issue in *Drake Bakeries* provided for compulsory and

6

binding arbitration of:

> all complaints, disputes or grievances arising between [the parties] involving questions of interpretation or application of any clause or matter covered by this contract or any act or conduct or relation between the parties hereto, directly or indirectly.

*Id.* at 257.  The *Drake Bakeries* Court found that the broad language of the clause did not "exclude claims or complaints of the employer."  *Id.*  For that reason, the Court held that the agreement's arbitration clause obligated the employer to arbitrate its claim for damages.  *Id*. at 257-264.  The *Drake Bakeries* arbitration clause was obviously more broadly worded than the arbitration clause in the Master Agreement, as it did not only mention "employees" but instead spoke in terms of "the parties" and "all complaints...arising between them."

In a companion case to *Drake Bakeries*, *Atkinson v. Sinclair Refining Co.*, the arbitration and grievance procedures were more narrowly worded than the arbitration clause in the Master Agreement.  *Atkinson*, 370 U.S. at 243.  In *Atkinson*, the arbitration clause at issue provided that local arbitration boards:

> *...shall consider only* individual or local employee or local committee grievances arising under the application of the currently existing agreement.

*Id.* (emphasis added).  The Court said there was "not a word in the grievance and arbitration article providing for the submission of grievances by the company" and called this an "express, flat limitation that arbitration boards should consider only employee grievances."  *Id.*  This "only...employee" wording is obviously more narrowly worded than the arbitration clause in the Master Agreement.  Thus, neither the *Drake* nor the *Atkinson* arbitration clauses accurately reflect the language of the Master Agreement.

## A. Explicit inclusion or explicit exclusion?

Kroger argues that where there is no explicit provision allowing the employer to invoke

the grievance and arbitration procedures, the employer is not bound to bring its claims to arbitration, citing the Third Circuit case of *Lehigh Portland Cement Co. v. Cement Workers Division, Boilermakers Union*, 849 F.2d 820 (3d Cir. 1988).  In contrast, Local 89 argues that instead of pointing to an explicit allowance for employer grievances, Kroger must actually point to an explicit exclusion of employer grievances to avoid dismissal of its counterclaim, citing the Fourth Circuit case of *Domino Sugar Corp. v. Sugar Workers Local Union 392*, 10 F.3d 1064, (4th Cir. 1993) and the Second Circuit case of *Coca-Cola Bottling Co. v. Union Local 812*, 242 F.3d 52 (2d Cir. 2001).  Local 89 asserts this is a product of the "presumption of arbitrability" that may be rebutted only when a court can say with positive assurance that an arbitration clause is not susceptible to an interpretation that covers the dispute.  *USW v. Cooper Tire & Rubber Co.*, 474 F.3d 271, 277-78 (6th Cir. 2007) (holding that in deciding the arbitrability of a dispute, a court "must begin with the presumption that national labor policy favors arbitration" where there is a collective bargaining agreement containing an arbitration clause).

There appears to be a genuine conflict among the circuits regarding the explicit inclusion/explicit exclusion debate.  Further, neither party has cited any Sixth Circuit law on the subject.

In *Lehigh*, the Third Circuit Court of Appeals considered whether "the *company* is required to bring its claims to an arbitrator when the collective bargaining agreement establishes procedures which limit the initiation of arbitration solely to the union."  *Lehigh*, 849 F.2d at 822 (emphasis in original).  The court said:

> ...when a contract contains *no language which explicitly contemplates or permits the employer to initiate arbitration* procedures, and the grievance structure is designed solely to afford the union the right to arbitrate, we have held that an employer, despite the presence of arbitration procedures in the collective bargaining agreement, is not bound to

> assert its claims before an arbitrator.  Rather, we have permitted the employer to bring its
> claim against the union in the district court.

*Id.* (citing *Affiliated Food Distributors, Inc. v. Local 229, Int'l Brotherhood of Teamsters*, 483

F.2d 418 (3d Cir. 1973); *Boeing Co. v. Auto Workers*, 370 F.2d 969, 971 (3d Cir. 1967)

(emphasis added)).

In contrast, the *Lehigh* court said that where there is ambiguous language in the contract,

"and the contract can be read to provide for the employer initiating arbitration, this court has

held that the strong presumption in favor of arbitration requires that the employer must arbitrate

his grievance."  *Id.*  For example, in *Eberle Tanning Co. v. Section 63L, FLM Joint Board,*

*Allegheny Division, United Food and Commercial Workers International Union*, the Third

Circuit held that the employer was required to arbitrate is grievance because:

> While the first steps of the grievance procedures set forth in the agreement between
> Eberle and the union were designed to be employee initiated, later steps of the process
> called for both Eberle and the union to meet monthly to resolve grievances. Significantly,
> it provided, in addition, that "should the grievance remain unsettled, either party may
> refer it to a three (3) man Board of Arbitration."

*Id.* (citing *Eberle*, 682 F.2d 430, 432 (3d Cir. 1982)).  The *Eberle* court held that the quoted

language, above, created "an ambiguity concerning the Company's duty to arbitrate its

grievances, an ambiguity which" had to be resolved "consistent with federal labor policy," which

strongly favors arbitration.  *Id.* (quoting *Eberle*, 682 F.2d at 434).

In the Fourth Circuit's *Domino Sugar*, "the [collective bargaining agreement (CBA)] did

not specifically indicate that the Company could request a grievance conference or arbitration.

However, nothing in the CBA precluded the Company from pursuing these procedures."

*Domino Sugar*, 10 F.3d at 1066.  The court first considered that:

> the Supreme Court has consistently articulated a strong presumption in favor of

9

arbitrability in labor cases. Thus, when a labor agreement contains an arbitration provision, the Supreme Court requires us to find in favor of arbitrability "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

*Id.* at 1069 (quoting *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650, (1986) (quoting *United Steelworkers of Am. v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 583-84 (1960))).

The *Domino Sugar* court stated that because of the presumption of arbitrability, it had to:

interpret a collective bargaining agreement as imposing arbitration requirements on an employer unless "there is an express, flat limitation that arbitration boards should consider *only* employee grievances."

*Id.* (quoting *Atkinson,* 370 U.S. at 243 (emphasis added)).  The court reasoned that because the *Atkinson* court found that an arbitration clause stating that arbitration was limited to "*only* individual or local employee or local committee grievances" did not require an employer to submit its grievances to arbitration, unless an arbitration clause is limited to "only" employee grievances, employers will be required to submit their disputes to arbitration.  *Id.*

In the Second Circuit's *Coca-Cola Bottling Co.*, the collective bargaining agreement contained an arbitration clause in one Article of the agreement, broadly stating that "'all complaints, disputes, controversies or grievances between the Company and its employees, or between the Union or any member of the Union and the Company' are subject to mandatory and binding arbitration 'after full satisfaction of the grievance procedure.'"  *Coca-Cola Bottling Co.*, 242 F.3d at 56.  The clause "after full satisfaction of the grievance procedure" was a new addition to the agreement, along with a grievance procedure, and the parties disputed the effect of the new clause.  *Id.*

10

The *Coca-Cola Bottling Co.* court said the clause "may have been intended to clarify that employees could not bypass the newly inserted Article 44 grievance procedure and proceed directly to arbitration under the previously existing Article 19." *Id.* at 56-57.  The court further said, "if the parties had wished to limit the arbitration clause to employee-initiated grievances, they could have done so explicitly." *Id.* at 57.  Therefore, the court compelled arbitration because it could not say "with positive assurance...that the insertion of the clause was necessarily intended to preclude employer-initiated complaints from arbitration." *Id.* (citing *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).

**B.  The Master Agreement**

Clearly, Section 8.1 of the Master Agreement concerns employee grievances, but it does not limit grievances "only" to employee-initiated grievances.  In making its argument that the Master Agreement only permits arbitration of grievances brought by employees, Kroger ignores Article 9, Sections 9.1 and 9.3 of the Agreement.  Section 9.1, the "no-strike clause," states:

> During the term hereof, the Union agrees that there shall be no strike or any other interference with or interruption of the normal conditions of the Employer's business by the Union or its members.  The Employer agrees that there shall be no lockout.

Section 9.3  provides in regards to grievances:

> Within five (5) working days of filing a grievance claiming violation of this Article, the parties to this Agreement shall proceed to the final step (Article 8, Section 8.1, Step 3.) of the grievance procedure without taking any intermediate steps, and other provision of this Agreement to the contrary notwithstanding.

The Court finds that Section 9.3 sets forth the process that applies to a grievance alleging a violation of Article 9.  This relates to grievances over "lockouts" and the "no strike" provisions outlined in Section 9.1.  The grievance procedure concerning those disputes is different than employee grievances over other disputes concerning the interpretation or application of the

11

Master Agreement.  Section 9.3 refers to the Article 8 grievance procedures, but does not require adherence to any of the steps outlined in Section 8.1 except for Step 3.  Sections 8.2 and 8.3 build off of Step 3.

If the Court were only interpreting Article 8, there is case authority to support the arguments of both Kroger and Local 89.  As noted above, the Master Agreement also contains Article 9, Sections 9.1 and 9.3.  Section 9.3 does not limit grievances to "employee" complaints, much less "only employee" complaints.

The Court agrees with Local 89 that it is illogical to follow Kroger's interpretation of the Master Agreement, focusing only on the wording of Section 8.1, without considering the provisions of Article 9, which actually contains the no-strike clause, along with a section specifically devoted to grievances over violations of that article.  Considering the agreement as a whole, the Court finds that Kroger is required to bring its grievance over the no-strike clause to arbitration.  It has failed to do so and has not exhausted its contractual remedies.  Therefore, Local 89's Motion to Dismiss is **GRANTED** as to Count I of Kroger's counterclaim.

## 2. The Secondary Boycott Claim

Count II of Kroger's counterclaim against Local 89 states:

The threats by Zuckerman, ratified by the International, to cause a strike by Transervice and/or Zenith employees in furtherance of Local 89's dispute with Kroger is a violation of the secondary boycott law, 29 U.S.C. Section 158(b)(4)(ii)(B).

Section 303 of the Labor Management Relations Acts, 29 U.S.C. § 187, provides:

It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 8(b)(4) of the National Labor Relations Act, as amended [29 USCS § 158(b)(4)].

Section 8(b)(4)(ii)(B) of the NLRA provides that it is an unfair labor practice for a union

12

or its agents to "threaten, coerce, or restrain any person engaged in commerce" with the purpose of forcing or requiring them "to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person..." These activities are known as secondary boycott activities.

Section 8(b)(4)(B) also contains protects a "primary strike or primary picketing" that is "not otherwise unlawful." *NLRB v. Local 825, International Union of Operating Engineers*, 400 U.S. 297 (1971). Legitimate pressure by a labor organization "aimed at the employer with whom there is a primary dispute...is protected even though it may seriously affect neutral third parties." *Id.* at 303 (citing *Steelworkers (Carrier Corp.) v. NLRB*, 376 U.S. 492, 502 (1964); *Electrical Workers (General Electric) v. NLRB*, 366 U.S. 667, 673 (1961)). Therefore, disputed conduct must be classified under the statute as either "primary" or "secondary." *Id.*

The secondary boycott is thought of as "pressure brought to bear, not 'upon the employer who alone is a party [to a dispute], but upon some third party who has no concern in it' with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands." *Id.* at 302-03 (citing *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 386-390 (1969); *Electrical Workers, Local 501 v. NLRB*, 181 F.2d 34, 37 (CA2 1950), aff'd, 341 U.S. 694 (1951)).

In *Local 825*, a general contractor on a construction project subcontracted all of the work on the project to three companies. *Id.* at 300. All three subcontractors employed operating engineers who were members of Local 825, International Union of Operating Engineers, but one subcontractor did not have a collective-bargaining agreement with Local 825. *Id.* That subcontractor, White, installed an electric welding machine at the site and assigned the job of working it to members of another union. *Id.* "Local 825's job steward and its lead engineer

13

threatened White with a strike if operating engineers were not given the work," but White

refused. *Id.* Local 825 then threatened both White and the general contractor with a strike

unless the general contractor signed a contract, "which would [also] be binding on all three

subcontractors...giving Local 825 jurisdiction over all power equipment, including electric

welding machines, operated on the jobsite." *Id.* The general contractor and White refused, and

the operating engineers employed by all three subcontractors walked off the job. *Id.* at 300-01.

The United States Supreme Court held that Local 825's coercive activity was secondary

activity because it was aimed directly at the general contractor and the subcontractors that were

not involved in the dispute. *Id.* at 304.  It encouraged strikes by its members employed by the

neutral subcontractors. *Id.* "The union engaged in a strike against these neutral employers for

the specific, overt purpose of forcing them to put pressure on White to assign the job of

operating the welding machine to operating engineers." *Id.* Local 825 did not direct its efforts at

all phases of the general contractor's normal operation, but "instead us[ed] a sort of pressure that

was unmistakably and flagrantly secondary." *Id.* (citing *NLRB v. Denver Building &

Construction Trades Council*, 341 U.S. 675 (1951)).

The counterclaim alleges that beginning in the fall of 2006, Kroger announced its

intention to transfer operational responsibility for the KDC to Transervice and Zenith.  Kroger

alleges that in October of 2006, Fred Zuckerman made numerous and continuous threats to

engage in a strike against Kroger over this transfer of operational responsibility.  These threats

included a threat to picket Kroger at locations in cities other than Louisville.

It is also alleged that Zuckerman continuously threatened a strike by former Kroger

employees against Kroger after those employees were hired by Transervice and Zenith, and the

threatened strike was supported and ratified by IBT.

14

The counterclaim then asserts in paragraph 9:

The above threats by Zuckerman and other Teamsters continued through February, 2007 when the operations were transferred to Transervice on or about February 15 and Zenith on or about February 22.

Local 89 claims the alleged threats do not constitute a secondary boycott.  Local 89's alleged threat to picket and boycott Kroger was made in response to Kroger's announcement that it would be subcontracting the work at the KDC.  Local 89 argues that it aimed its alleged threats only at Kroger, a *primary* employer whom it believed was threatening to violate a collective bargaining agreement.

Kroger concedes that it was a primary employer.  However, Kroger argues that Local 89's argument ignores the threat of economic action against Transervice and Zenith, whom Local 89 concedes were neutral secondary employers.  Kroger concludes:

These secondary threats are the essence of Kroger's secondary boycott claim.  Of course Local 89's primary dispute was with Kroger.  It was the threats against Zenith and Transervice that were obviously unlawfully secondary.

Local 89 replies:

Kroger's secondary boycott claim therefore rests on the allegation that Local 89: (1) engaged in secondary activity against Transervice and Zenith; and (2) this secondary activity caused damage to Kroger...

...A strike could not possibly be secondary activity, however, because Local 89 could not strike Zenith and Transervice until Local 89 represented their employees. Had Kroger alleged that Local 89 threatened to picket Zenith and Transervice in furtherance of a strike against Kroger, the analysis might be different, but Kroger alleges no such thing.

Kroger's counterclaim also alleges in paragraph 7:

Zuckerman also continuously threatened a strike by former Kroger employees against Kroger after they were hired by Transervice and Zenith.

This allegation could be interpreted as a threat to strike not only Kroger but also Transervice and Zenith.  If it is, then this could be sufficient to survive a motion to dismiss.  The

15

Court will give a liberal reading of the counterclaim.  The argument as to damages is significant, but again, this is a motion to dismiss.  The Court believes better factual support is needed.

For these reasons, Count II of Kroger's counterclaim, alleging a violation of the secondary boycott law, will not be dismissed, and Local 89's Motion to Dismiss is **DENIED** as to Count II.

## CONCLUSION

For the foregoing reasons, Local 89's Motion to Dismiss the Counterclaim is **GRANTED in part** and **DENIED in part**.

An appropriate order shall issue.

16