UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO.: 3:07-CV-351-TBR

| | |
|---|---|
| TEAMSTERS LOCAL UNION NO. 89 | PLAINTIFF |
| | COUNTERCLAIM DEFENDANT |
| v. | |
| THE KROGER CO. | DEFENDANT |
| | COUNTERCLAIMANT |
| v. | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS | COUNTERCLAIM DEFENDANT |

**MEMORANDUM OPINION**

This matter is before the Court upon three interrelated motions for summary judgment. Plaintiff Teamsters Local Union No. 89 has filed a Motion for Summary Judgment (Docket #65). Counterclaim Defendant International Brotherhood of Teamsters has filed a Motion for Summary Judgment (Docket #66). Defendant The Kroger Company has responded jointly to both motions (Docket #68). Plaintiff has replied (Docket #72). Counterclaim Defendant has replied (Docket #73). Defendant The Kroger Company has filed a Motion for Summary Judgment as to its claims against Plaintiff Teamsters Local Union No. 89 (Docket #67). Plaintiff has responded (Docket #70). Defendant has replied (Docket #74). These matters are now ripe for adjudication.

**BACKGROUND**

This matter arises from a complaint to compel arbitration filed by Teamsters Local Union No. 89 ("Local 89") against The Kroger Company ("Kroger"). Kroger has filed counterclaims against both Local 89 and International Brotherhood of Teamsters ("IBT"), the international

union of which Local 89 is a local member, for breach of a collective bargaining agreement and for violations of the secondary boycott law. Local 89 is a local union, with its principal office and place of business in Louisville, Kentucky, chartered by IBT. Jurisdiction rests in this Court under sections 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

The following facts are undisputed. In the fall of 2006, Kroger announced its intention to transfer operational responsibility for its Distribution Center in Louisville, Kentucky ("KDC") to two subcontractors, Transervice Logistics, Inc. ("Transervice") and Zenith Logistics, Inc. ("Zenith"). At that time, Kroger employees at the KDC were represented by Local 89 for the purposes of collective bargaining, and Kroger and Local 89 were party to a collective bargaining agreement known as the Kroger Master Agreement ("Master Agreement"), effective September 11, 2005, through September 10, 2011, as well as a local supplemental agreement ("Supplement Agreement") covering issues related to local operations.

The Master Agreement was negotiated between the Teamster Kroger National Negotiating Committee ("TKNNC") and Kroger in 2005. The TKNNC is comprised of six local unions which represent Kroger employees, including Local 89. John Williams and Fred Zuckerman negotiated the most recent Master Agreement with Kroger. John Williams ("Williams") is the Warehouse Director for IBT and chief spokesperson of the TKNNC. Fred Zuckerman ("Zuckerman") is a principal officer of Local 89 and represents Local 89 on the TKNNC.

When Kroger announced its intention to subcontract its operations at the KDC to Transervice and Zenith, Williams, on behalf of the TKNNC, and Zuckerman, on behalf of Local 89, began working on an agreement with Kroger. Negotiations took place from November 2006

through April 2007. In February 2007, while these negotiations were ongoing, Kroger transferred its transportation operations to Transervice and its warehouse operations to Zenith. Transervice hired all of Kroger's former transportation employees and Zenith hired all of Kroger's former warehouse employees.

Beginning in March 2007, Zuckerman began separate negotiations with Transervice and Zenith on behalf of Local 89. Williams and the TKNNC were not involved in these negotiations. Tentative agreements were initially reached, but fell apart over issues related to pension and health care benefits. As a result, the workers of Local 89 struck Transervice and Zenith on April 19, 2007 on Kroger's property at the KDC. The strike ended on April 20, 2007 when agreements were reached with Transervice and Zenith. In late April 2007, Local 89 and Kroger entered into an agreement in a Letter of Understanding concerning various grievances pertaining to the operational transfer from Kroger to Transervice and Zenith.

Local 89 then discovered that work previously performed by Local 89 members at the KDC was being performed by subcontractors who did not have a collective bargaining agreement with Local 89. On May 9 and August 24, 2007, pursuant to the procedures set forth in the Master Agreement, Local 89 filed grievances alleging that Kroger was violating the Master Agreement, the Supplement Agreement and the Letter of Understanding by subcontracting work at the KDC to subcontractors other than Transervice and Zenith. Local 89 now seeks to compel arbitration under the Master Agreement, or, in the alternative, receive damages under § 301 of the LMRA for Kroger's breach of the Letter of Understanding. Kroger counterclaims that Local 89 and IBT violated the secondary boycott law, 29 U.S.C. § 158(b)(4)(ii)(B).

**STANDARD**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "The mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

**DISCUSSION**

**I. Breach of Master Agreement**

Local 89 alleges that Kroger breached the Master Agreement when it subcontracted work previously performed by Local 89 members to third-party subcontractors other than Transservice

and Zenith.  Under the terms of the Master Agreement, Local 89 filed grievances pertaining to the alleged breach and now argues that Kroger must arbitrate those grievances per the terms of the Master Agreement's arbitration clause.  Kroger responds that, per the terms of both the Letter of Understanding and the arbitration clause of the Master Agreement, Kroger is no longer obligated to arbitrate grievances with Local 89.

### A.  Letter of Understanding

In April 2007, Kroger and Local 89 entered into an agreement expressed in a Letter of Understanding, the terms of which will expire on September 10, 2011, the same date of expiration as the Master Agreement.  The Letter of Understanding does not contain an arbitration clause, nor does it rescind the Master Agreement.  In fact, the Master Agreement is referenced throughout the Letter of Understanding.

Kroger points to Paragraph 5 of the Letter of Understanding to argue that it is no longer obligated to arbitrate future grievances with the union under the Master Agreement.  Paragraph 5 of the Letter of Understanding states,

> Kroger will meet with Teamsters Local 89 and either resolve any outstanding grievances resulting from their employment with Kroger or permit the grievances to proceed through the Kroger Master Grievance Process.

Kroger argues that, under Paragraph 5, the parties agreed that only outstanding grievances resulting from Kroger's employment of Local 89 members would be resolved by the Master Agreement's grievance procedure, which includes arbitration.  Because the May 9 and August 24, 2007 grievances were not "outstanding" at the time the Letter of Understanding was executed in April 2007, they are not covered by the Letter of Understanding.  In addition, Kroger argues that Paragraph 5 governs only grievances resulting from Kroger's employment of Local

5

89 members. Because Transervice and Zenith, not Kroger, were the employers of Local 89 members at the time the May 9 and August 24, 2007, grievances were filed, Kroger argues that it is under no obligation to arbitrate Local 89's grievances.

"Whether or not a company is bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court, and a party cannot be forced to 'arbitrate the arbitrability question.'" *Litton Fin. Printing Div. et al. v. N.L.R.B.*, 501 U.S. 190, 208-09 (1991) (quoting *AT & T Technologies, Inc. v. Commc'ns Workers*, 475 U.S. 643, 651 (1986)). In *International Union v. Cummins, Inc.*, the Sixth Circuit summarized the four principles governing a court's determination of whether a dispute is arbitrable. 434 F.3d 478, 485 (6th Cir. 2006). These four principles are:

> 1) a party cannot be forced to arbitrate any dispute that it has not obligated itself by contract to submit to arbitration;
> 2) unless the parties clearly and unmistakably provide otherwise, whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue for judicial determination;
> 3) in making this determination, a court is not to consider the merits of the underlying claim; and
> 4) where the agreement contains an arbitration clause, the court should apply a presumption of arbitrability, resolve any doubts in favor of arbitration, and should not deny an order to arbitrate unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*Id.*

Local 89 relies on *United Steelworkers v. Cooper Tire & Rubber*, 474 F.3d 271 (6th Cir. 2007), to argue that the Letter of Understanding is a side letter that is arbitrable under the Master Agreement. In *Cooper Tire*, the Sixth Circuit adopted the scope test to determine whether a dispute over a side letter that does not provide for arbitration falls within a collective bargaining agreement's arbitration clause. *Id.* at 279. Kroger responds that the Letter of Understanding is

not a side letter, and therefore *Cooper Tire* is inapplicable to this case. The Court disagrees.

In *Cooper Tire*, the Sixth Circuit distinguished a side letter from a side settlement. The court explained,

> Courts often use the terms "side letter," "side agreement," "side settlement," and "settlement agreement" interchangeably. For purposes of this opinion, we use "side letter" and "side agreement" to connote an agreement separate from the underlying [collective bargaining agreement]. However, where the agreement settles a dispute arising under the underlying [collective bargaining agreement], we use the terms "settlement agreement" or "side settlement."

*Id.* at 274 n.3. Here, the Letter of Understanding is a separate agreement from the Master Agreement. It was negotiated between Local 89 and Kroger in response to Kroger's decision to subcontract its work at the KDC to Transervice and Zenith. While it also settles a limited number of grievances arising under the Master Agreement, the primary focus of the Letter of Understanding was to separately bargain over the effects of Kroger's decision to transfer its transportation and warehouse operations. Therefore, the Court finds that the Letter of Understanding is a side letter.

Under the scope test set forth in *Cooper Tire*, the Court begins its inquiry by analyzing the collective bargaining agreement's arbitration clause. *Id.* at 279. "With the scope of the arbitration clause in mind, [the court] then look[s] to the subject matter of the side agreement to determine if it falls within the clause's intended coverage." *Id.* "[P]arties may exclude disputes arising under a side agreement from arbitration should they include a statement to that effect in the arbitration clause of the [collective bargaining agreement] or in the side agreement." *Id.*

The arbitration clause is located in Article 8 of the Master Agreement. It provides for arbitration of "any grievance dispute or complaint over the interpretation or application of the contents of this Agreement." As in *Cooper Tire*, the Court construes this arbitration clause

broadly. *Id.*

The Letter of Understanding concerns the benefits Kroger will require successor subcontractors to provide hired Local 89 members. It also provides a procedure for resolving the outstanding grievances filed by Local 89 against Kroger. The Letter of Understanding frequently references the Master Agreement. However, it also contemplates that Kroger no longer employs the Local 89 members. For example, Paragraph 2 provides that if at any time Kroger should decide to discontinue its subcontracting and resume its operation of the KDC, then "Kroger agrees to directly employ all bargaining unit members then performing the reassumed work. . . . The terms and conditions of their employment will be governed by the Master Agreement, and the Local 89 Supplement covering such employees." As Kroger points out, this language suggests that the benefits of the Master Agreement only apply to Local 89 members when they are directly employed by Kroger. Indeed, this reading of the Letter of Understanding is consistent with the Master Agreement itself, which provides for arbitration "should *any employee* have any grievance dispute or complaint over the interpretation or application of the contents of this Agreement . . ." (emphasis added).

Nonetheless, the Court remains mindful of the presumption favoring arbitration and its duty to read a collective bargaining agreement as "'more than a contract,' and as an instrument covering the 'whole employment relationship.'" *Id.* at 280 (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)). "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Warrior & Gulf*, 363 U.S. at 582-83.

Here, the Letter of Understanding does not include an arbitration clause; however, neither does it include a clause providing that subsequent grievances could not be filed or arbitrated under the Master Agreement. While Paragraph 5 clearly states that outstanding grievances shall be resolved under the Master Agreement's grievance procedure, its silence as to future grievances does not necessitate that they be governed by a procedure other than arbitration. Given the presumption in favor of arbitration, the Court finds that the Letter of Understanding is within the scope of the Master Agreement and its arbitration clause.

### B. Arbitration Clause of Master Agreement

Because the Court has determined that arbitration is appropriate under the Letter of Understanding, it need not to determine whether Kroger is separately compelled to arbitrate Local 89's grievances under the arbitration clause of the Master Agreement.

## II. Breach of the Letter of Understanding

In the alternative, Local 89 argues that Kroger breached the Letter of Understanding in violation of § 301 of the LMRA, 29 U.S.C. § 185, when it subcontracted work previously performed by Local 89 members to third-party subcontractors other than Transervice and Zenith.

Because the Court has determined that this issue is appropriate for arbitration, it will not consider Local 89's argument at this time.

## III. Secondary Boycott

A secondary boycott occurs where a union brings economic pressure on a "primary employer" by affecting a "secondary employer" doing business with the primary employer. *F.A. Wilhelm Const. Co., Inc. v. Ky. State Dist. Council of Carpenters, AFL-CIO*, 293 F.3d 935, 938

(6th Cir. 2002). "[A] secondary boycott is illegal if the union seeks to persuade secondary employees to boycott the primary employer, but it is not illegal if the secondary employees act purely on their own initiative to boycott the services of the primary employer." *Id.* (citing *Local 761, Int'l Union of Elec., Radio & Mach. Workers v. N.L.R.B.*, 366 U.S. 667, 672-73 (1961)).

Kroger alleges that Local 89's threats to strike Transervice and Zenith were in furtherance of its dispute with Kroger in violation of the secondary boycott law, National Labor Relations Act, § 8(b)(4)(ii)(B), as amended, 29 U.S.C. § 158(b)(4)(ii)(B). Section 158(b)(4)(ii)(B) makes it an unfair labor practice for a labor organization "to threaten, coerce, or restrain" one employer with the object of forcing another employer "to cease doing business" with that employer. Here, Kroger claims that Local 89 threatened to strike Transervice and Zenith with the object of forcing Kroger to cease doing business with Transervice and Zenith.

In its motion for summary judgment, Local 89 argues that it did not engage in secondary boycotting because its primary dispute was with Transervice and Zenith, not Kroger, and it took no action against Kroger. Kroger responds that a factual dispute exists over Local 89's intent, and argues that Local 89's intent was to pressure Kroger so that it ceased doing business with Transervice and Zenith..

In determining whether a union has violated the secondary boycott law, "the court must decide if the union's actions were directed at the secondary employer or merely had ancillary consequences for that employer." *Id.* at 940. This a factual question of the union's intent. *Id.* "Whether the union was motivated by a secondary objective is a question of fact and is to be determined by the totality of the union's conduct under the circumstances." *Id.*

Local 89 presents several arguments for why there is no dispute of fact that its actions

10

were not directed at Kroger. First, Local 89 argues that its primary dispute was with Transervice and Zenith, not Kroger, because it had its own labor agreements with Transervice and Zenith and it could lawfully strike Transervice and Zenith under those agreements. However, whether or not Local 89 could lawfully strike Transervice and Zenith as employers says nothing about its true intent in doing so. In other words, Local 89 could have legitimate reasons for striking Transervice and Zenith and nonetheless choose to strike them because it sought to exert economic pressure on Kroger.

Second, Local 89 relies on the Supreme Court's decisions in *N.L.R.B. v. International Rice Milling Co.*, 341 U.S. 665 (1951), and *N.L.R.B. v. Local 825, International Union of Operating Engineers*, *ALF-CIO*, 400 U.S. 297 (1971), to argue that it had no secondary object in striking Transervice and Zenith. The Court finds these cases inapposite to the case before it.

*International Rice* involved employees who picketed a mill to secure recognition of their right to bargain collectively. 341 U.S. at 667. However, in the course of their picketing, they encouraged two truck drivers working for a neutral employer, who was a customer of the mill, to refuse to pick up an order of rice produced by the mill. *Id.* The issue before the Court was not the intent of the strikers, but rather whether the inducement of the neutral employees amounted to a secondary boycott violation. *Id.* at 670-71. The Court concluded that it did not, explaining that "[i]nsofar as the union's efforts were directed beyond that and toward the employees of anyone other than [the mill], there is no suggestion that the union sought concerted conduct by such other employees." *Id.* at 671. In short, the holding of *International Rice* is that "[a] union's inducements or encouragements reaching individual employees of neutral employers only as they happen to approach the picketed place of business generally are not aimed at concerted, as

11

distinguished from individual, conduct by such employees. Generally, therefore, such actions do not come within the proscription of [section] 8(b)(4), and they do not here." *Id.*

While the Court explained that Congress did not intend to interfere with a union's traditional right to strike by passing the secondary boycott law, *id.* at 672-73, the Court did not hold in *International Rice*, as Local 89 suggests, that "unless the union makes an appeal to the employees of a secondary employer, other than may be as the inevitable consequence of primary picketing, there is no unlawful secondary boycott." *International Rice* is distinguishable from the present case because there are no allegations that Local 89 induced neutral employees.

*Local 825* involved an alleged secondary boycott violation wherein union employees struck all three subcontractors working on the same construction site to force the general contractor and one of the subcontractors to effectuate a change in their bargaining positions with the union. 400 U.S. at 300-01. The difficult question for the Court was whether the union's intent was to put pressure on the general contractor through the three subcontractors to force the general contractor to "cease doing business with" the one subcontractor the union was in dispute with. *Id.* at 304. The Court explained that disruption of business relationships is a necessary consequence of striking and these "foreseeable disruptions are . . . clearly protected." *Id.* However, the Court determined that the "clear implications" of the union's demands on the general contractor were to force him to either change his policy with the subcontractor or cease doing business with it. *Id.* at 305. Therefore, the Court held that the union violated the secondary boycott law.

Local 89 argues that *Local 825* means "that a strike for a lawful objective can have devastating secondary effects upon a neutral [employer] and remain entirely lawful." While this

is true, that conclusion would only apply if the Court determined that the union's intent was not to put economic pressure on Kroger. Here, Kroger offers into evidence public statements made by Zuckerman stating that the strike was to exert economic pressure on Kroger (Zuckerman Dep. 63:1-12, Oct. 2, 2008), Zuckerman's statements that Local 89 could not strike Kroger because it was bound by the no-strike provision of the Master Agreement (Zuckerman Dep. 64:2-68:1, Oct. 2, 2008) and documentation indicating that Kroger was the object of the strike (Williams Dep. 76:10-15, Oct. 21, 2008). Kroger maintains that this evidence demonstrates that Local 89's objective was to pressure Kroger from subcontracting its work at the KDC to third-party subcontractors. However, because Local 89 believed itself bound by the no-strike clause of the Master Agreement with Kroger, it could only strike Transervice and Zenith. Thus, Kroger argues that Local 89 lawfully threatened to strike Transervice and Zenith to effectuate a change in its dealings with Kroger.

"The relevant inquiry under §§ 8(b)(4)(B) and 8(e) is whether a union's activity is primary or secondary - that is, whether the union's efforts are directed at its own employer on a topic affecting employees' wages, hours, or working conditions that the employer can control, or, instead, are directed at affecting the business relations of neutral employers and are 'tactically calculated' to achieve union objectives outside the primary employer-employee relationship. . . The inquiry is often an inferential and fact-based one, at times requiring the drawing of lines 'more nice than obvious.'" *N.L.R.B. v. Int'l Longshoremen's Ass'n, AFL-CIO*, 473 U.S. 61, 81 (1985) (internal citations omitted). At this time, Kroger has put forth sufficient evidence to raise a factual question as to Local 89's intent in threatening to strike. The emphasis of Local 89's arguments is that it lawfully struck Transervice and Zenith, but this is not the issue before the

13

Court. The basis of Kroger's allegations are not the strike itself, but the *threats* made by Zuckerman to strike Transervice and Zenith in order to put pressure on Kroger. The Court finds it would be premature to rule on Local 89's motion for summary judgment given the complexity of the circumstances surrounding the threats and the limited and conflicting evidence currently before it.

## IV. International Brotherhood of Teamsters Counterclaim

Kroger alleges that IBT ratified strike threats made by Local 89 in violation of the secondary boycott law, 29 U.S.C. § 158(b)(4)(ii)(B). IBT argues that it is a separate legal entity from both the TKNNC and Local 89, and as such, it has never been party to a collective bargaining agreement with Kroger. Therefore, Kroger's counterclaim against it must be dismissed because IBT did not authorize, ratify, or participate in any actions taken by Local 89.

An international union can be held liable for the illegal activity engaged in by its local affiliate where the common law rule of agency applies. *Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 216 (1979). However, an international union is not responsible for its local union's strikes where the international union did not instigate, support, ratify, or encourage any of the local union's work stoppages. *Id.* at 217-18; *see also Melvin v. Local Union No. 436, Intern. Broth. of Teamsters*, 779 F.2d 51, 1985 WL 13785, at *1 (6th Cir. 1985).

The Court finds that IBT was not a party to the Master Agreement. IBT was not a signatory to the agreement and Kroger has offered no evidence in support of its assertion that IBT is party to the agreement through the TKNNC. The fact that the IBT constitution provides that the TKNNC is comprised of representatives appointed by the IBT, without more, is insufficient to demonstrate that IBT retains control over the TKNNC. *See Teamsters Local No.*

*984 v. Humko Co.*, 287 F.2d 231, 242 (6th Cir. 1961), *cert. denied*, 366 U.S. 962 (1961) (finding that international union retained control over local union where terms of union constitution demonstrated international union's involvement and international union representative was active participant in local activities); *see also Barefoot v. Int'l Brotherhood of Teamsters*, 424 F.2d 1001, 1004 (10th Cir.), *cert. denied*, 400 U.S. 950 (1970) ("the provisions of the Teamsters constitution do not, standing alone, directly create agency but do grant to the national body broad if not plenary powers of supervision and control over the local affiliates"). Nonetheless, IBT can be held liable for the threats made by Local 89 where it instigated, supported, ratified, or encouraged those threats.

Kroger argues that IBT ratified the strike threats by authorizing strike benefits to be paid to Local 89. Kroger cites to a January 12, 2007 letter from IBT stating, "The International Union granted Local Union 89 approval on November 13, 2006, to cover approximately 850 members in the event of a potential work stoppage against Kroger," (Ex. 12), to argue that IBT was aware of and ratified Local 89's intent to threaten to strike Transervice and Zenith in order to put economic pressure on Kroger.

"In other cases an international union has been considered engaged in a joint enterprise with a local or responsible for the activities of the local and its agents when the International admitted having joined the local in authorizing the general conduct which led to the unfair practices, when the international advised, sympathized or financially supported such general conduct, when the International through its constitution or bylaws or by some other means commanded or required the activities resulting in the unfair labor practices, or when the International controlled the operations of the local." *Harnischfeger Corp. v. Sheet Metal*

15

*Workers Intern. Ass'n*, AFL-CIO, 436 F.2d 351, 354 (6th Cir. 1970) (quoting *N.L.R.B. v. Int'l Longshoremen's Union*, 283 F.2d 558, 565-66 (9th Cir. 1960) (internal citations omitted)).  Here, Kroger cites to only one provision of the IBT constitution, which alone does not demonstrate that IBT commanded or required the activities performed by Local 89.  Furthermore, the fact that IBT authorized the potential payment of worker benefits stemming from a proposed strike (ultimately, no benefits were ever paid) does not evidence that IBT was a principal actor in this case.  For these reasons, the Court finds, as a matter of law, that Kroger has provided insufficient evidence to raise a question of material fact as to IBT's engagement in Local 89's alleged secondary boycott activities.

## CONCLUSION

For the foregoing reasons, Plaintiff Teamsters Local Union No.89's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART in that the Court compels arbitration of the claims alleged in Plaintiff's complaint, but allows Defendant to proceed on his secondary boycott counterclaim against Plaintiff.  Counterclaim Defendant International Brotherhood of Teamster's Motion for Summary Judgment is GRANTED.  Defendant The Kroger Company's Motion for Summary Judgment is DENIED.

An appropriate order shall follow.